IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **FRANCIS NICOLE PFEIFFER**, | : | Case No. 1:10cv672 |
| | : | |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | **ORDER GRANTING** |
| | : | **DEFENDANTS' MOTION FOR** |
| **BUTLER COUNTY SHERIFF** | : | **SUMMARY JUDGMENT AND** |
| **DEPARTMENT, et al.**, | : | **DENYING AS MOOT** |
| | : | **DEFENDANTS' MOTION FOR** |
| Defendants. | : | **SEPARATE TRIALS** |

This is a civil rights action brought by Plaintiff, Francis Nicole Pfeiffer, against Butler County and two of its corrections officers. Pfeiffer seeks redress for alleged violations of her constitutional rights that occurred during her twelve-day incarceration at the Butler County Jail in June 2010. Before the Court are Defendants' motion for summary judgment (Doc. 22) and motion for separate trials (Doc. 27). For the reasons that follow, the motion for summary judgment is **GRANTED**. Because granting Defendants' motion obviates the need for a trial, Defendants' motion for separate trials is **DENIED AS MOOT**.

**I. BACKGROUND**[1]

The Court narrowed Pfeiffer's claims when it granted in part Defendants' motion for judgment on the pleadings. *See* Doc. 31. Pfeiffer's remaining claims are those brought under 42 U.S.C. § 1983 against Butler County and Corrections Officers Baker and Slone for their alleged

---

[1] Except as otherwise indicated, background facts are drawn from Defendants' statement of proposed undisputed facts (Doc. 22-1) to the extent they are admitted by Plaintiff in her response thereto (Doc. 29).

1

violation of her rights under the Fourth, Eighth, and Fourteenth Amendments to the United

States Constitution.  Also remaining are Pfeiffer's Ohio law claims against Corrections Officers

Baker and Slone for negligent failure to provide adequate medical care and intentional infliction

of emotional distress.  Pfeiffer's claims are premised on three categories of alleged mistreatment:

inadequate medical care, unsanitary hygiene conditions, and insults and intimidation by

corrections officers.

### A.  Medical Care

Francis Pfeiffer was arrested on charges of domestic violence and obstructing official

business.  She was taken to the Butler County Jail where she was incarcerated for twelve days —

from June 5, 2010 until June 16, 2010.  Two days before her incarceration, on June 3, 2010,

Pfeiffer was seen and treated by her family physician, Dr. Scott Glickfield, for congestion and

wheezing in her chest.  Dr. Glickfield prescribed Pfeiffer three medications to treat this

condition: Avelox (an antibiotic), Prednisone (a corticosteroid), and a ProAir inhaler.  Pfeiffer

did not take the Avelox prior to her June 5, 2010 incarceration, and she did not bring any

medications with her to the jail on June 5, 2010.[2]  Pfeiffer had been prescribed several

medications prior to June 2010 for the treatment of anxiety and/or panic attacks including

Buspirone, Risperdal, and Klonopin (Clonazepam).  However, Pfeiffer had not been taking any

medications for "about a month" prior to her arrest on June 5, 2010.[3]

_____

[2]  Although Pfeiffer was at her home when she was arrested, it is unclear whether she had
an opportunity to get her medicine before she was taken to jail.  *See* Pfeiffer Dep. (Doc. 24) at 67
(saying she did not grab a purse or anything else when she went to jail).

[3]  When asked during her deposition, "When you came into the jail, were you taking any
medications?"  Pfeiffer responded, "No."  Pfeiffer Dep. at 67.  When asked whether she
remembered the last time she had taken her medicine before getting to jail on June 5, 2010,
Pfeiffer responded, "It had been about a month."  Counsel then asked, "So, you weren't taking

When Pfeiffer arrived at the jail, unnamed corrections officers placed her in an isolated jail cell until she formally was booked eighteen hours later. Pfeiffer Dep. 62. During this period of pre-booking confinement, Pfeiffer slept and did not tell anyone at the jail that she was having any medical problems. *Id*. at 83. Butler County Jail Correction Officers Maria Slone and Tim Baker, sued in their individual capacities in this case, were not working when Pfeiffer was booked.

When a corrections officer finally booked Pfeiffer, the officer asked Pfeiffer numerous questions about her medical and social history and recorded this information on an intake "screen form." Pfeiffer Dep. Ex. B. This form reflects that Pfeiffer told the corrections officer she was under the care of Dr. Glickfield and was prescribed "hydrocodine" and "proazepam."[4] *Id*. The form indicates that Pfeiffer said she'd had a miscarriage a couple of weeks prior but had no other medical problems the jail medical staff should know about.[5] The form also reflects that Pfeiffer had attempted or contemplated suicide a more than a year before but was not currently contemplating suicide. Pfeiffer admits that when the corrections officer conducting the booking interview asked about the three-inch scar below Pfeiffer's elbow on the inside of her left arm, Pfeiffer acknowledged that the wound had been self inflicted.

---

your medications?" and Pfeiffer answered, "No. I had stopped taking my medications." *Id*. at 71-72.

[4] Pfeiffer testified during her deposition that she took hydrocodone for pain and clonazepam for anxiety. She believes the corrections officer meant clonazepam instead of "proazepam."

[5] In fact, Pfeiffer's miscarriage was in the summer of 2009, approximately one year before her arrest and incarceration at Butler County Jail.

3

Pfeiffer claims that the information recorded by the booking officer did not accurately reflect her answers to the officer's questions. Pfeiffer claims she told the booking officer that she had "walking pneumonia" and wanted to see a medic, but that information is not recorded on the form. Pfeiffer Dep. 102-03.

After being booked into jail, Pfeiffer showered and was placed in the jail's general population. Shortly thereafter, Pfeiffer was moved back to the isolation cell in the booking area where she was placed under suicide watch. The parties dispute why Pfeiffer was removed from the general population and placed in an isolation cell. Defendants claim, and a June 5, 2010 Jail Incident Report indicates, that Pfeiffer approached a corrections officer and stated that she needed to go on suicide watch because she felt like she wanted to hurt herself. Doc. 22-2 at 29. Pfeiffer disputed this at her deposition, stating that she did not request to be taken to suicide watch but was taken to isolation in response to the onset of a panic attack. In her words,

> It's not like I wanted to go there [to isolation]. It was that I couldn't breathe and I was having problems – I was having problems catching my breath and calming down and I went to go talk to [an unnamed female corrections officer] and she said that all she could do was put me back in suicide watch. . . . I didn't really care where I went or what happened. I wanted to calm down and be able to catch my breath.

Pfeiffer Dep. 104-05.

When moved into the isolation cell for suicide watch, Pfeiffer was required to change out of her jail uniform and underwear and put on a "pickle suit," a heavy green suicide prevention gown worn by inmates placed in isolation at the Butler County Jail. The isolation cell is made mostly of glass so that the inmate can be observed by the corrections officers in the booking area. Pfeiffer remained on suicide watch during most of her incarceration at the Butler County

4

Jail.[6]   Pfeiffer wanted medication to treat her panic attack, and when she was moved to the

isolation room she asked to see a medic.  *Id*. at 106-08.  Pfeiffer was told that a medic "should be

there soon."  *Id*. at 108.  Pfeiffer testified that she continued to have panic attacks the whole time

she was in isolation and that she told Corrections Officers Slone and Baker that she was having

these attacks.

Medics met with and evaluated Pfeiffer on either June 7 or June 11.[7]  Pfeiffer told the

medics she was having panic attacks.  A medic took Pfeiffer's blood pressure, asked what

medications Pfeiffer was supposed to be taking, and asked whether a family member could bring

the medication to the jail.  While the medic was present, Pfeiffer called her mother and asked her

to bring Pfeiffer's medications to the jail.  Pfeiffer testified, "I only asked her to bring my anti-

anxiety medicine," namely, the non-narcotic drug Buspirone.  Pfeiffer testified that she had a

panic attack during this conversation with her mother.  *Id*. at 124.  She said the medics could tell

she was having a panic attack and that the female medic rubbed her back and tried to get her to

calm down.  *Id.*

Pfeiffer's mother brought four medications (none of them Buspirone) to the jail either

that day or the next: Acyclovir, Lexapro, Prednisone, and the ProAir inhaler.  Pfeiffer Dep. at

127 and Ex. C.  Pfeiffer testified that these were the medications that her mother could find and

---

[6]  Pfeiffer was on suicide watch from June 5 through at least June 10, 2010.  Pfeiffer was
moved back to general population for some period of time between June 10 and June 12, 2010.
A June 12, 2010 Jail Incident Report reflects that, while in general population, Pfeiffer told a
corrections officer that she was suicidal and that Pfeiffer was then transferred back to suicide
watch.  Doc. 22-2 at 30.  Pfeiffer stayed on suicide watch until her release on June 16, 2010.

[7]  Pfeiffer testified that she saw two medics on June 7, 2010.  Pfeiffer Dep. at 122.  The
Inmate Medical Record recorded by the medic is dated June 11, 2010.  Doc. 22-5 at 8.

that three — the Lexapro, Prednisone, and ProAir — were in her mother's car from when Pfeiffer had been to Dr. Glickfield and had filled the prescriptions just before her arrest.

It is undisputed that Pfeiffer was not given any medications during her twelve-day incarceration. The jail's medical policy provides that inmates are to be given prescribed drugs if the drugs are permitted to be in the facility. A number of medications, including narcotics, are not approved to be in the facility. Pfeiffer was aware of jail policy which precluded dispensing narcotics to inmates. Clonazepam and hydrocodone, the two medications recorded on Pfeiffer's intake form as the medications prescribed to her, are narcotics. Leah Johnson, a licensed social worker and member of the jail's forensic staff, testified that she offered Pfeiffer Lexapro, a non-narcotic, but that Pfeiffer did not want to take it. Johnson Dep. 19.[8] Johnson met with Pfeiffer in isolation several times for the purpose of evaluating Pfeiffer's mental health. Johnson testified that Pfeiffer appeared to suffer from depression and anxiety but that Pfeiffer refused the depression medication (Lexapro) and only wanted the narcotic anxiety medications that were prohibited by jail policy. *Id*. at 37. Pfeiffer admits that the social workers wanted her to take the Lexapro but says no one gave it to her.[9] Pfeiffer claims that she requested her medication almost every day from a female corrections officer who was not Officer Slone.

Pfeiffer was released from Butler County Jail on the morning of June 16, 2010. That afternoon, she presented at the emergency room of Atrium Medical Center. Pfeiffer went to the emergency room in an effort to comply with a judge's orders to obtain a psychiatric evaluation following her discharge from jail. The social worker who interviewed Pfeiffer at the emergency

---

[8] The transcript of the deposition of Leah Johnson is filed as Doc. 26.

[9] Pfeiffer testified, "The social workers wanted me to [take my Lexapro], but how can I take it when nobody was giving me my medicine?" Pfeiffer Dep. at 163.

room concluded that Pfeiffer did not meet admissions criteria for a psychiatric evaluation.  When questioned about her respiratory condition, Pfeiffer stated that although she never took the antibiotics prescribed by Dr. Glickfield, "she actually got better while incarcerated," that her "breathing is much better," and that she "had no chest pain, nausea or vomiting."  Glickfield Dep. Ex. B, BC24-00858.[10]  Pfeiffer reported that she had been having some "right lower quadrant pain for the last year since she had a miscarriage" but did not report any vaginal bleeding.  *Id*.  Pfeiffer's physical exam was "completely unremarkable, with normal lung sounds" and her chest x-ray was normal.  *Id*. at BC24-00861.  Pfeiffer was discharged home without any antibiotics or other medication.

### B.  Conditions of Confinement

In June 2010, inmates on suicide watch were offered showers daily, during third shift, from 11:00 p.m. to 7:00 a.m.  Pfeiffer was aware that inmates in isolation were permitted to shower only during the third shift.  Pfeiffer Dep. 135.  The parties agree that Pfeiffer took only two showers during her twelve-day incarceration.  However, they dispute the reason why Pfeiffer had only two showers.  Pfeiffer testified that she was not permitted to take a shower while she was on suicide watch and that the two showers she had occurred when she was in the jail's general population.  The daily Crisis Intervention Checklists recorded by the corrections officers responsible for monitoring Pfeiffer while she was on suicide watch contradict this.  The checklists reflect that Pfeiffer refused the shower offered to her during the third shift on June 7, 2010; took a shower during the third shift on June 9, 2010; and again refused a shower during the third shift on June 12, 2010.  Doc. 22-2 at 33, 35, and 39.

---

[10]  The transcript of the deposition of Dr. W. Scott Glickfield is filed as Doc. 25.

Pfeiffer alleges that she had contractions and vaginal bleeding the whole time she was in jail and was denied feminine hygiene products.  When asked if there was any evidence of her alleged bleeding, Pfeiffer testified that there was blood around the toilet of her cell.[11]  Pfeiffer does not claim that there was blood anywhere else, including on her "pickle suit" or on her cot.  Corrections Officers Slone and Baker did not observe any blood in Pfeiffer's cell or on her clothes.  Slone Aff. ¶ 7; Baker Aff. ¶ 7.[12]  Pfeiffer claims that she showed the blood around the toilet to an unnamed corrections officer with short curly hair, who then gave her some toilet paper to clean it up.  Pfeiffer testified that she asked this corrections officer for a Tampax and was told she could not have one because she was on suicide watch.[13]  Pfeiffer did not ask Corrections Officers Slone or Baker for Tampax.  Pfeiffer Dep. 147.  The social worker who saw Pfeiffer regularly during her incarceration, Leah Johnson, did not notice that Pfeiffer had any body odor or personal hygiene issues, and Pfeiffer never complained to Johnson about not having feminine hygiene products available.  Johnson Dep. 25.

### C.  Taunting

Pfeiffer claims that Officers Slone and Baker frequently taunted her while she was in isolation.  Pfeiffer claims that the taunting started after she asked Officer Slone if she could be

---

[11]  Pfeiffer testified that the toilet of the cell was concealed by a little wall to give the inmate privacy.

[12]  The Affidavit of Maria Slone is filed as Doc. 22-3.  The Affidavit of Tim Baker is filed as Doc. 22-4.

[13]  Pfeiffer's testimony on this point is inconsistent.  When asked during her deposition, "are you saying that the jail employees intentionally refused to give you, for example, the feminine hygiene products?" she answered, "No."  Pfeiffer Dep. 165.

8

taken to the hospital.[14] Pfeiffer testified at her deposition that she'd tap on the window of her cell and Officers Slone and Baker would tell her to "stop crying" and "get over it." Pfeiffer Dep. 142-43. She claims that Officer Baker called her a "stupid bitch" two or three times and that Officer Slone told her to stop crying and to stop acting like a baby. Pfeiffer also claims that she told Officer Slone that she was having trouble with her contact lenses because she was not supposed to sleep in them and that Officer Sloan laughed at her. Officers Slone and Baker are the only two officers who Pfeiffer claims were not respectful of her needs and treated her unlawfully. *Id*. at 191, 196.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. "Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Cresher v. Neyer*, 477 F.3d 784, 796 (6th Cir. 2007) (citing Fed. R. Civ. P. 56(a)). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). The nonmoving party must provide more than a scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). That is, the nonmoving party must present sufficient evidence to permit a reasonable jury to find in that party's favor. *Id*.

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the

---

[14] Pfeiffer testified that she was not sure when she asked to be taken to the hospital but that it was a couple of days after she saw the medics. Pfeiffer Dep. 176.

burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  In responding to

a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go

beyond the pleadings and "present affirmative evidence in order to defeat a properly supported

motion for summary judgment."  *Anderson*, 477 U.S. at 257.  The Court's task is not "to weigh

the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial."  *Liberty Lobby*, 477 U.S. at 249.

## III.  ANALYSIS

### A.  Action against Officers Baker and Slone Under 42 U.S.C. § 1983

Under 42 U.S.C. § 1983, an individual may bring a private cause of action against anyone

who, under color of state law, deprives a person of rights, privileges, or immunities secured by

the Constitution or conferred by federal statute.  *Blessing v. Freestone*, 520 U.S. 329, 340

(1997).  In this case, Pfeiffer alleges violations of her Fourth, Eighth, and Fourteenth

Amendment rights.

When a suit alleges that an officer has violated a plaintiff's constitutional rights during

the officer's performance of discretionary functions, a court must evaluate the claim under the

framework of qualified immunity.  *Feathers v. Aey*, 319 F.3d 843, 847 (6th Cir. 2003).  The

doctrine of qualified immunity is an officer's key defense to a § 1983 action.  *Parsons v. City of

Pontiac*, 533 F.3d, 492, 500 (6th Cir. 2008).  That doctrine provides "that government officials

performing discretionary functions generally are shielded from liability for civil damages insofar

as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

To determine whether qualified immunity attaches, the Court must ask if the facts alleged, taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Parsons*, 533 F.3d at 500. If there was not a constitutional violation, then there is no need to inquire further about qualified immunity. *Saucier*, 533 U.S. at 201. If there was a constitutional violation, the Court then determines if the specific rights violated were clearly established at the time of the violation. *Id.* at 202; *see also Parsons*, 533 F.3d at 500.[15] This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. According to these legal principles, to avoid summary judgment based upon qualified immunity, Pfeiffer must show that Officers Slone and Baker violated one or more of her constitutional rights and that those rights were clearly established at the time of the challenged action.

### 1. Fourth and Eighth Amendment Claims

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Pfeiffer does not allege any facts that can be construed as providing the basis for a claim under the Fourth Amendment, nor does she advance any argument whatsoever regarding

---

[15] A court may, in its discretion, decide which of the two qualified immunity prongs to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that the sequence of the steps set out in *Saucier* is not mandatory). In this case, it is appropriate to fist consider whether a constitutional violation occurred because answering that question in the negative makes consideration of the second prong unnecessary.

any such claim.  Accordingly, the Court grants Defendants' summary judgment motion as to Pfeiffer's Fourth Amendment claim.

The Eighth Amendment does not apply to pretrial detainees such as Pfeiffer, whose analogous right to be free from cruel and unusual punishment is under the Fourteenth Amendment's due process clause.  *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979).  Pfeiffer concedes this in her opposition memorandum.  Accordingly, the Court grants Defendants' summary judgment motion as to Pfeiffer's Eighth Amendment claim.

### 2.  Fourteenth Amendment Claim

A pretrial detainee's due process rights under the Fourteenth Amendment "are at least as great as the Eighth Amendment protections available to a convicted prisoner."  *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (citing *Bell*, 441 U.S. at 535 n.16).  Thus, suits filed by pretrial detainees challenging conditions of confinement under the Fourteenth Amendment are analyzed under the same framework as claims filed under the Eighth Amendment.  *Id.*

### a.  Medical Care

The Due Process Clause of the Fourteenth Amendment forbids prison officials from "unnecessarily and wantonly inflicting pain" on an inmate by acting with "deliberate indifference" toward the inmate's serious medical needs.  *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A constitutional claim for denial of medical care has both an objective and a subjective component.  *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825 (1994); *Napier v. Madison Cnty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001); *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)).

12

The objective component of the claim requires the existence of a "sufficiently serious" medical need, and "the inmate must show that [s]he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The standard for determining the existence of a detainee's serious medical need depends on whether the medical need is an obvious one or is minor but becomes serious because of a delay in treatment. *Blackmore*, 390 F.3d at 897-98 (discussing the two "separate branch[es] of Eighth Amendment decisions"). When the inmate's claim arises from an injury or illness "'so obvious that even a layperson would recognize the need for a doctor's attention,'" it is sufficient for the inmate to show that he or she "actually experiences the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Blackmore*, 390 F.3d at 899-900 (quoting *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir. 1990)). In contrast, where an inmate claims that a delay in treatment has caused injury, loss, or handicap, the inmate must supply "verifying medical evidence" to demonstrate that the delay caused a serious medical injury. *Id.* at 899 (discussing *Napier,* 238 F.3d 739).

Even when liberally construing the facts in her favor, Pfeiffer has failed to show that she suffered from a medical need that was sufficiently serious to satisfy the objective component of her claim. Pfeiffer suffered from chest congestion, panic attacks, and cramps and bleeding apparently related to a 2009 miscarriage while incarcerated at Butler County Jail. None of these conditions were so obviously serious that even a layperson would recognize the need for a doctor's attention. Pfeiffer testified that she requested to see a medic because she was having panic attacks and that she asked Officers Slone and Baker to take her to the hospital at some

13

point because her stomach hurt.[16]  There is no evidence that Pfeiffer ever complained of chest

congestion or chest pain while incarcerated.

Pfeiffer's medical ailments are not analogous to those that courts have found to be "so

obvious that even a lay person would easily recognize the necessity for a doctor's attention."

*Blackmore*, 390 F.3d at 899-900 (quoting *Gaudreault*, 923 F.2d at 208).  By way of example, the

"obviousness" standard has been satisfied when a prisoner had an asthma attack, a heart attack,

and an appendicitis.  *See Harrison v. Ash*, 539 F.3d 510, 519 (6th Cir. 2008) ("[T]he symptoms

associated with an asthma attack — wheezing, difficulty breathing, tightness in the chest — are

quite obvious and recognizable even to a lay person"); *Estate of Carter v. City of Detroit*, 408

F.3d 305, 312 (6th Cir. 2005) (plaintiff "displayed the 'classic' signs of a serious illness . . . an

impending heart attack" when she complained of chest pain, had trouble breathing, and said she

was three days behind in taking her heart medication); and *Blackmore*, 390 F.3d at 899 (plaintiff

complained of "sharp" and "severe" stomach pains for an extended period of time and vomited

— "a clear manifestation of internal physical disorder").  Pfeiffer's testimony that she was

crying and told Officers Slone and Baker that her stomach hurt is insufficient to support a

conclusion that Pfeiffer was suffering from a medical condition that would have caused a

layperson to recognize the need for a doctor's attention.

Neither has Pfeiffer presented any "verifying medical evidence" sufficient to demonstrate

that a delay in treating any of her conditions caused a serious medical injury.  With respect to her

chest congestion, medical records made the date of Pfeiffer's release from Butler County Jail

---

[16]  Pfeiffer described the symptoms related to her 2009 miscarriage as "stomach" pain. *See* Pfeiffer Dep. 143 ("My stomach was hurting and I was having contractions and bleeding.") and 151 ("[M]y stomach hurt . . . [b]ecause I had a miscarriage and I was still suffering from problems from the miscarriage.")

demonstrate that Pfeiffer said she "actually got better while incarcerated," and her physical exam revealed "no shortness of breath, no labored breathing, no remarkable cough, no wheezing, no hemoptysis." Glickfield Dep. Ex. B at BC24-00858.[17] With respect to her panic attacks, Pfeiffer advances no evidence or argument that delay in treatment had any effect on her health. With respect to her cramps and vaginal bleeding, Pfeiffer submits no verifying medical evidence sufficient to demonstrate that a delay in treatment caused a serious medical injury.[18] The facts of this case are not analogous to those in which plaintiffs have adequately supported the objective prong of the "deliberate indifference" analysis with verifying medical evidence. *See*, *e.g.*, *Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005) (holding that plaintiff who was a diabetic and required insulin injections at regulated intervals and who was admitted to the hospital immediately after discharge from jail demonstrated an objectively serious medical condition).

Even if Pfeiffer had satisfied the objective component by demonstrating that she suffered from a serious medical need, she has failed to satisfy the subjective component of the analysis. The subjective component requires an inmate to show that prison officials have acted with the

---

[17] At some point after her incarceration, Pfeiffer developed a MRSA [Methicillin-resistant Staphylococcus aureus] infection, and Dr. Glickfield testified that he "couldn't say" whether it had anything to do with her not receiving her antibiotics while in jail. Glickfield Dep. 41-42. Dr. Glickfield's primary concern about Pfeiffer not receiving her antibiotic while in jail was that starting and not finishing an entire prescribed course of antibiotics can create "superbacteria." *Id*. at 40-41. Dr. Glickfield was unnecessarily concerned: Pfeiffer testified that she never took any of the antibiotic that Dr. Glickfield prescribed for her chest congestion, thus her incarceration did not result in her starting and not finishing the medication.

[18] Dr. Glickfield opined that the jail's failure to provide Pfeiffer with feminine hygiene products could have harmed her physically by causing rashes and irritation and mentally because Pfeiffer has a "history of bipolar and depression." Glickfield Dep. Ex. A. However, Dr. Glickfield admitted that he did not see Pfeiffer "for a while after the incarceration" and never saw any evidence of resulting physical or emotional problems. *Id*. at 43-44.

sufficiently culpable state of mind in denying medical care, that is, deliberate indifference. *Blackmore*, 390 F.3d at 895.  Deliberate indifference "entails something more than mere negligence" but can be satisfied by something less than acts or omissions done for the purpose of causing harm or with knowledge that harm will result.  *Id.* at 895-96 (quoting *Farmer*, 511 U.S. at 835).  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  Further, "[t]he subjective component must be addressed for each officer individually."  *Garretson*, 407 F.3d at 797.  Thus, the actions of persons other than the named defendants, Officers Slone and Baker, are not relevant to this Court's determination of whether Officers Slone and Baker were deliberately indifferent to Pfeiffer's need for medical care.

Pfeiffer's sole evidence regarding her claim of denial of medical care as to Officers Slone and Baker is her testimony that these officers witnessed her having panic attacks and heard her complain of stomach pain but took no action to obtain medical services for her.  Missing is any evidence that Officers Slone or Baker drew the inference that Pfeiffer faced a substantial risk of serious harm.  To the contrary, the evidence demonstrates that the officers did not believe that Pfeiffer was suffering from a serious medical condition but, on the contrary, was "acting like a baby."  While such comments, if made, may indicate callousness on the part of the officers, it also reflects that the officers did not believe that Pfeiffer risked any serious harm.  For these reasons, Pfeiffer has failed to demonstrate that Officers Slone's and Baker's conduct violated her constitutional right to medical care.

**b.  Conditions of Confinement**

16

Because "'[confinement in a prison . . . is a form of punishment subject to scrutiny under the Eighth Amendment standards,'" the conditions under which a prisoner is confined must not compose cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 345 (1981) (quoting *Hutt v. Finney*, 437 U.S. 678, 685 (1978)). "Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Id*. at 347. In particular, prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). As with claims alleging the denial of medical care, an inmate alleging cruel and unusual conditions of confinement must satisfy both the objective and subjective requirements: the deprivation alleged must be, objectively, sufficiently serious — namely, resulting in the denial of "the minimum civilized measure of life's necessities," and the prison official must act with deliberate indifference to the inmate's health or safety. *Id*. at 834.

Pfeiffer states that there is a disputed issue of material fact whether she was kept "alone for eighteen hours without food or water" during her pre-booking period of incarceration. Defendants deny that Pfeiffer was held in the booking area for eighteen hours without food or water. Pfeiffer admits that breakfast was served during this time but claims that she was asleep and the corrections officers did not wake her. Whether Pfeiffer was held for eighteen hours without food or water is not material to the resolution of her claims in this case. Pfeiffer does not rely on this alleged deprivation of food and water to support any of her claims against Officers Baker or Slone, whom she admits were not working when she was booked into the jail. Accordingly, the Court does not find this to be a disputed issue of material fact precluding summary judgment.

17

Similarly, even assuming that the Eighth Amendment requires inmates to be offered showers daily, Pfeiffer fails to present evidence to demonstrate that Officers Slone or Baker had any part in the alleged deprivation of a daily shower.  Neither officer worked third shift during Pfeiffer's incarceration, which Pfeiffer does not dispute is the only time showers are offered to inmates on suicide watch.  Slone Aff. ¶¶ 5, 11; Baker Aff. ¶¶ 5, 11.  Further, as a male corrections officer, Officer Baker would not have been involved in showering of female officers. Baker Aff. ¶ 11.

Finally, Pfeiffer asserts that the deprivation of tampons constitutes an absence of the minimal civilized measure of life's necessities.  Even if true, Pfeiffer admits that she never requested feminine hygiene products from Corrections Officers Slone or Baker during her incarceration.  Further, Pfeiffer submit no evidence to refute Officers Slone's and Baker's affidavits in which they say they did not observe any blood in Pfeiffer's cell or on her clothes. Slone Aff. ¶ 7; Baker Aff. ¶ 6.  Because there is no evidence to support a finding that Officers Slone and Baker were aware of Pfeiffer's need for feminine hygiene products, Pfeiffer's claim that they were deliberately indifferent to her need for these products must fail.  For these reasons, Pfeiffer has failed to demonstrate that Officers Slone and Baker violated her constitutional right to conditions of confinement that are not cruel and unusual punishment.

### c. Taunting

To the extent that Pfeiffer alleges that Officers Slone's and Baker's taunting comprised a violation of her right to be free from cruel and unusual punishment, that claim also fails. Harassment and verbal abuse do not constitute the type of infliction of pain that the Eighth Amendment prohibits. *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004). In *Johnson*, the plaintiff claimed that a correctional officer continuously banged and kicked plaintiff's cell door, threw his food trays through the bottom slot of his cell door so hard that the top flew off, made insulting remarks to him, growled and snarled through his window, smeared his window to prevent him from seeing out, and behaved in a racially prejudicial manner. *Id*. at 545. The Sixth Circuit determined that "while the allegations, if true, demonstrate shameful and utterly unprofessional behavior . . . they are insufficient to establish an Eighth Amendment violation." *Id*. at 546. In this case, Pfeiffer claims that Officer Slone told her to stop crying and stop acting like a baby and that Officer Baker called her a stupid bitch. As in *Johnson*, this alleged behavior is entirely unprofessional but is insufficient to establish an Eighth Amendment violation.

To summarize, Pfeiffer has failed to subjectively establish deliberate indifference on the part of either Corrections Officers Slone or Baker and thus has failed to demonstrate that a constitutional violation occurred during her June 2010 incarceration at the Butler County Jail. Accordingly, the officers are entitled to qualified immunity on the 42 U.S.C. § 1983 claims asserted against them.

**B.  Action Against Butler County Under 42 U.S.C. § 1983**

Butler County claims that it is entitled to summary judgment in its favor because Pfeiffer has failed to show a constitutional violation by its employees in the first instance.  "To establish municipal liability under section 1983, the plaintiff must establish that: (1) the plaintiff's harm was caused by a constitutional violation; and (2) the [municipality] was responsible for that violation."  *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009).  "Municipalities are liable for harms resulting from a constitutional violation only when the injury resulted from an 'implementation of [the municipality's] official policies or established customs.'" *Id.* (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 708 (1978)).  A municipality cannot be held liable in § 1983 actions on a respondeat superior theory.  *Monell*, 436 U.S. at 691.

In this case, Pfeiffer has not presented evidence sufficient to support a finding that a constitutional violation occurred.  Even had a violation occurred, Pfeiffer has not put forth evidence to support her claim that any constitutional violation was the result of an official policy or established custom of Butler County.  Accordingly, Butler County is entitled to summary judgment on Pfeiffer's § 1983 claims against it.

**C.  State Law Claims Against Officers Baker and Slone**

Defendants do not move for summary judgment on Pfeiffer's state law claims against Officers Baker and Slone.  Rather, they argue that because Pfeiffer cannot establish any actionable federal claims in this case, the Court should decline to exercise jurisdiction over the pendent state law claims.  The Court agrees.

Pendent jurisdiction is discretionary, and if a court dismisses federal claims before trial, it may dismiss the state claims as well.  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726

(1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.") Accordingly, the Court dismisses without prejudice Pfeiffer's state law claims against Officers Slone and Baker.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment (Doc. 22) is **GRANTED** as to Pfeiffer's 42 U.S.C. § 1983 claims. Pfeiffer's pendent state law claims are **DISMISSED**.


IT IS SO ORDERED.


                                   ___s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court